J-S27031-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: A.C., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.C., FATHER | No. 2723 EDA 2014 |

Appeal from the Order entered August 19, 2014,
in the Court of Common Pleas of Philadelphia County, Family Court,
at No(s): CP-51-DP-0001680-2013, FID No. 51-FN-003321-2013

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, and FITZGERALD*, JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED AUGUST 13, 2015**

A.C. ("Father") appeals from the order entered in the Philadelphia County Court of Common Pleas adjudicating dependent his daughter, A.C. ("Child"), born in April of 2013, and finding he perpetrated child abuse against her.[1]  Father argues the court erred in finding he physically abused Child, alleging Child "did not suffer severe pain" and "the injuries to [her] were accidental."  Father's Brief at 8, 9.  We affirm.

The trial court set forth the factual and procedural history as follows.

On August 3, 2013, [the Philadelphia Department of

---

* Former Justice specially assigned to the Superior Court.

[1] At the time of the hospital visit precipitating this matter, Child was four months old.  At the time of the adjudication hearing, she was one year and four months old.  By separate order, the trial court also adjudicated dependent L.C., Father's three-year-old daughter.  Father did not appeal from that order.

G.R. ("Mother), the mother of Child and L.C., took an appeal from both children's adjudication orders.  This Court affirmed at **Interest of L.C.**, 2689 EDA 2014 (unpublished memorandum) (Pa. Super. Aug. 10, 2015).

Human Services ("DHS")] received a Child Protective Services . . . report, which alleged that Mother took Child,[2] a 4 month old, to St. Christopher's Hospital for Children ("Hospital") because Child was bleeding from her mouth. While at Hospital, Child received an evaluation, which revealed that Child sustained rib fractures on her left and right side, which were in the healing stage, hemorrhage of her left eye, a laceration across the entire floor of her mouth, and an abrasion on her cheek. [N.T., 8/19/14, at 11.] Subsequently, doctors admitted Child to Hospital.

[The following day, o]n August 4, 2013, DHS spoke to parents at Hospital and parents were unable to provide an explanation for Child's injuries. On August 5, 2013, Mother told DHS that Father frequently squeezed Child in an attempt to relieve her body of gas. Mother also explained to DHS that the rib fracture might have happened when Child fell off the bed about a month ago or from [her sister, L.C.,] sitting on Child's back while playing. [*Id.* at 14.] Mother stated, to DHS and to Dr. [Maria] McColgan ("Doctor"), [the Medical Director of the Child Protection Program at Hospital,3] that Father scratched Child's mouth with his fingernail while attempting to insert a pacifier in her mouth. Initially, Mother explained that Father called Mother while she was away from the home and told her that Child needed to go to the hospital because Father was unable to stop her mouth from bleeding. [*Id.* at 12-13.] However, Doctor testified that when [he] spoke to Mother, [she] told [him] she was at home when . . . Father reached behind him to put Child's pacifier in her mouth and that is how the laceration happened. [*Id.* at 13.] Father corroborated Mother's explanation regarding how the incidents occurred. Doctor testified that [he] explained to Mother that the type of injury Child sustained, posterior rib fractures, were unlikely from someone squeezing Child and not a result of a direct blow or . . . a fall. After Doctor gave this

---

[2] In its opinion, the trial court referred to Child as "Child #1" and her sister as "Child #2." For ease of discussion, henceforth we refer to A.C. as "Child" and refer to L.C by her initials.

[3] N.T. at 9.

- 2 -

explanation, Mother immediately responded, "I knew it was him." [*Id.* at 15.] Mother then stated . . . Father would sometimes try to help Child's stool when she was having trouble by squeezing on her abdomen. [*Id.* at 15, 32-33, 45.] Doctor diagnosed the inflicted injury as . . . a result of physical abuse because the injuries . . . would not have been from just pressing on the abdomen, someone would have to be squeezing the ribcage in order to create the fractures Child sustained. [*Id.* at 15, 19.] Doctor also testified that some of the injuries occurred at separate times. [*Id.* at 19.] On August 7, 2013, DHS learned that Hospital determined that Child's injuries were non-accidental.

On August 8, 2013, DHS obtained an Order of Protective Custody ("OPC") and the Hospital discharged Child and [L.C.] into the care of their aunt and uncle. On this day, a Safety Plan was implemented in the home of the children's aunt and uncle. The Safety Plan stated that the children's parents were not to have visitation with the children for 21 days and that the aunt and uncle would ensure that the children's basic needs, including medical appointments, were met. On August 9, 2013, a shelter care hearing was held, the OPC was lifted, and the temporary commitment to DHS was ordered to stand.

Trial Ct Op., 11/4/14, at 2-3 (citations to record omitted).

On August 13, 2013, DHS filed separate petitions, for Child and L.C., for an adjudication of dependency. One year later, on August 19, 2014, the court held a hearing, at which the following witnesses testified: Dr. McColgan, whom Father stipulated was an expert in child abuse, the DHS caseworker, Father, and Mother.

At the hearing, the court found both Child and L.C. dependent,[4] and

_____

[4] The Juvenile Act defines a "dependent child" as, *inter alia*, a child who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or

- 3 -

found Father perpetrated child abuse against Child. N.T. at 66. The trial court found "both parents were the children's primary caregivers" but "found child abuse as to Father only." The DHS caseworker informed the court the parents have, on alternating Saturdays, supervised visits and unsupervised visits. N.T. at 67. She confirmed to the court there were "no issues" with the unsupervised visits and the court permitted them to continue. *Id.* at 68, 74. She further advised the court that a family service plan was already "scheduled," both parents completed several training programs,[5] and DHS was awaiting "the results of the parenting capacity evaluation that both parents have completed." *Id.* at 70-71. The parents were also referred to a housing program which "assist[s] parents in locating housing," because "the house is not appropriate."[6] *Id.* at 73.

On September 15, 2014, Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

---

emotional health, or morals." 42 Pa.C.S. § 6302(1). Father does not challenge the adjudication of dependency.

[5] Specifically, Father "completed anger management, parenting and healthy relationships." N.T. at 74. Mother "completed parenting, employment services, empowerment group[,] anger management," and "healthy relationships." *Id.* at 73.

[6] DHS caseworker Lissa Varghese testified the home was "not safe" because six adults and one child were living in the home in June of 2014, there was "high traffic" and the "children sustain [unexplained] injuries in the home." *Id.* at 35-36.

On appeal, Father does not challenge the underlying adjudication of dependency. Instead, he raises one question for our review: whether the trial court abused its discretion in finding he physically abused Child.[7] In support, he first asserts Child did not suffer severe pain. While Father concedes "Dr. McColgan testified [Child's] rib fracture would cause significant pain," Father avers the doctor also "indicate[d] it's subjective to . . . determine how much pain someone else," especially a child, "experiences," and thus Dr. McColgan "could not establish the level of pain suffered by" Child. Father's Brief at 8. Father maintains there is no history of child abuse or "even the slightest hint [he] intended to harm his child." *Id.* He further reasons that "doctors must report child abuse in any case where . . . abuse is even suspected," and thus "many 'suspected' cases are erroneous." *Id.* Father's second argument is that Child's injuries "were accidental." *Id.* at 9. He points out "[M]other took [Child] to the hospital after noticing injury" and he "also went to the hospital to help his child." *Id.*

---

[7] We note the argument section of Father's brief, at one and a half pages in length, fails to cite legal authority beyond a one-sentence definition, from *Interest of K.M.*, 53 A.3d 781 (Pa. Super. 2012), of "clear and convincing evidence." *See* Father's Brief at 8-9. Furthermore, the relevant statement in *Interest of K.M.* pertained to termination of parental rights, an issue not present in this case. *See Interest of K.M.*, 53 A.3d at 786 ("The burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid.").

We remind Attorney Rosenbaum that the failure to develop an argument with citation to and analysis of relevant authority may waive an issue on appeal. *See Harris v. Toys "R" Us-Penn, Inc.*, 880 A.2d 1270, 1279 (Pa. Super. 2005).

Father insists he "had no way of knowing about these injuries." *Id.* We find

no relief is due.

Our Supreme Court has stated:

> "[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." We review for abuse of discretion.

*Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (citation omitted).

> To adjudicate a child dependent, a trial court must determine, by clear and convincing evidence, that the child:
>
> > is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.
>
> 42 Pa.C.S.A. § 6302. "Clear and convincing" evidence has been defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue."

*In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (some citations omitted).

Section 6303(b)(1) of the Child Protective Services Law[8] defines "child

abuse" in pertinent part as follows:

---

[8] The version of Section 6303 cited was effective at the time of the underlying adjudication order. *See* 23 Pa.C.S. § 6303 (valid through December 31, 2014).

(i) Any recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age.

\* \* \*

(iii) Any recent act, failure to act or series of such acts or failures to act by a perpetrator which creates an imminent risk of serious physical injury to or sexual abuse or sexual exploitation of a child under 18 years of age.

23 Pa.C.S. § 6303(b)(1)(i), (iii). "Nonaccidental" is defined as "[a]n injury that is the result of an intentional act that is committed with disregard of a substantial and unjustifiable risk." 23 Pa.C.S. § 6303(a). In addition, "serious physical injury" is defined as "an injury that (1) causes a child severe pain; or (2) significantly impairs a child's physical functioning, either temporarily or permanently." *Id.*

On March 25, 2014, subsequent to the trial court's underlying dependency order, our Supreme Court decided *Interest of L.Z.*, in which it held:

> While a petitioning party must demonstrate **the existence of child abuse by the clear and convincing evidence** standard applicable to most dependency determinations, 42 Pa.C.S. § 6341(c) . . . the **identity of the abuser need only be established through *prima facie* evidence** in certain situations[ pursuant to 23 Pa.C.S. § 6381(d).]

*Interest of L.Z.*, 111 A.3d at 1174 (emphases added).

We note the following discussion by the Court:

> [C]hild abuse cases often involve a child presenting to a hospital with significant injuries that are entirely consistent with common types of child abuse and entirely inconsistent

- 7 -

with the implausible explanations concocted by the parents and responsible persons to avoid allegations of child abuse. . . . As the children may be too young or fearful to describe the abuse, CYS agencies are left to prove their case with only the physical evidence of injuries that would not ordinarily be sustained but for the action of the parents or responsible persons and the implausible statements of the parents and responsible persons. . . .

*Id.* at 1171.

The Court further held the presumption was rebuttable by the parent:

The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

*Id.* at 1185.

In the instant case, the trial court specifically found "[a]ll of DHS' witnesses credible." Trial Ct. Op. at 5. In finding Child's rib injuries were a result of abuse and not accident, the trial court stated the following.

[T]he Doctor's testimony established that the injuries Child sustained would not occur by someone just pressing on her abdomen, someone would have to be squeezing the ribcage in order to create the fracture. [N.T., 8/19/14, at 15.] The explanations the parents gave, that the fractures were caused either by Child falling from a bed or by L.C. sitting on Child's back, are not consistent with the injuries Child sustained. The Doctor testified that Child would have cried when the event occurred that fractured her ribs. . . . Parents were never able to explain Child's injuries in a way consistent with the type of injuries [she] sustained. Furthermore, the Doctor testified that the type of rib

fractures Child had are a type . . . that do not occur from an accidental injury. [*Id.* at 26.] Child had multiple rib injuries[:] lateral rib fractures and fractures on the left side still . . . healing. [*Id.* at 13-14.] The rib fractures [were] a serious injury causing significant on-going pain to Child. [*Id.* at 14, 17-18, 27.] Father also testified that in order to relieve Child of gas pains, he would push on her abdomen. [*Id.* at 45.] Mother had said that Child sometimes cried when . . . Father squeezed on her abdomen. Father testified that no doctor ever instructed him to push on Child's abdomen to relieve gas pains. [*Id.*]

Trial Ct. Op. at 4-5 (some record citations omitted).

With respect to Child's eye and mouth injuries, the court opined:

The Doctor testified that the hemorrhaging in the right eye was also from trauma and that an infant, such as Child, would not be able to self-inflict this type of injury to her own eye. [N.T. at 16, 18.] The Doctor also testified that the laceration to Child's mouth would not occur from an ordinary fingernail scratch, the laceration was across the entire floor of the mouth and deep under her tongue. Significant amount of force would be required to cause such an injury. [*Id.* at 24.] There were six other adults and three other children who live with parents[,] Child and [L.C.] Father testified that no other adult[ ] who lives in the house witnessed the injury to the mouth.

Trial Ct. Op. at 5.

The court further noted:

The injuries Child sustained while under the care of her parents could not be explained by her parents, the injuries were serious, and caused Child severe pain. The Doctor spoke with Mother, and Mother said that Father was the perpetrator of Child's rib fracture by exclaiming "I knew it was him" to the Doctor. [N.T. at 15.]

Trial Ct. Op. at 5. The court's findings are supported by the record.

We reject Father's assertion that Dr. McColgan "could not establish the level of pain suffered by the child." *See* Father's Brief at 8. Dr. McColgan testified Child "had bilateral fractures of the 11th ribs" which were approximately one to three weeks old at the time she was examined. N.T., at 11, 14. She testified that a rib fracture "is a serious injury. It would have caused pain to the child." *Id.* at 14. Moreover, Dr. McColgan testified:

> [DHS' counsel: I]n your opinion, how much pain would have Child occurred [sic] when she sustained the rib fracture?
>
> [A.] This would be significant pain. [I]t's subjective to be able to determine how much pain someone else experienced. A rib fracture is a fracture of the bone, which is typically severe pain.
>
> [Q.] Would Child cry? Would it be likely that she would cry?
>
> A. It would be likely that she would cry.

*Id.* at 17-18. Based on Dr. McColgan's testimony, we discern no abuse of discretion by the court in finding Child's bilateral rib fractures were a "serious physical injury" pursuant to section 6303. *See* 23 Pa.C.S. § 6303(a).

With respect to whether A.C.'s rib fractures were nonaccidental in cause, Dr. McColgan testified as follows:

> [DHS' counsel: I]n your professional opinion, would a four month-old incur these injuries on her own?
>
> [A.] No, these are not self-inflicted injuries. At four months of age, typically, you're just learning how to roll

- 10 -

over, maybe lifting your head, but you would not have enough movement to cause these injuries yourself.

[Q. I]n your professional opinion, is it likely that a four[-]month-old would sustain these injuries without some sort of non-accidental trauma?

[A.] You could have accidental injury, but the accidental injuries that were reported would not have accounted for all of these injuries, nor were they likely to have caused these injuries.

[Q.] Can you say, to a reasonable degree of medical certainty, that [Child's] injuries were caused by child abuse?

[A.] Yes, my diagnosis was physical abuse.

N.T. at 18-19; *see also id.* at 24-25. Based on Dr. McColgan's testimony, we likewise discern no abuse of discretion by the court in finding that A.C.'s rib fractures were nonaccidental in cause pursuant to section 6303.

In addition, Dr. McColgan testified about Child's mouth injury as follows. Child had a laceration "across the floor of the mouth, just behind the gum line," as well as "hematoma, which is a collection of blood underneath her tongue." *Id.* at 11. This injury was "relatively recent." *Id.* at 12. Mother's explanation, that Father caused it by putting a pacifier in her mouth, "should not" have caused the mouth injury. *Id.* at 13. Furthermore, Dr. McColgan replied "Yes," to the specific question of whether Child would have "been in pain when she received that injury." *Id.*

Dr. McColgan further testified Child's left eye had a "subconjunctival hemorrhage . . . which is a collection of blood in the white portion of the

eye. . . ." *Id.* at 11. Dr. McColgan opined the eye hemorrhage was from trauma, explaining:

> The white part of the eye—you can sometimes see hemorrhages there, usually from trauma. You can also get them from very severe coughing or very severe vomiting, but that's pretty unlikely in a three month—whatever she was—an infant, and there was no report of severe vomiting or coughing for [Child].

*Id.* at 16. In addition, Dr. McColgan testified there was no biological or medical reason for Child's eye hemorrhage. *Id.* at 16-17.

Dr. McColgan further testified Child "had abrasions on her face," including "a diagonal line across the cheek," approximately "a half to a centimeter wide by several centimeters long." *Id.* at 11. Dr. McColgan did not recall if an explanation for these cuts was provided. *Id.* at 16.

Significantly, Dr. McColgan testified Child's injuries were incurred on "at least two separate episodes:"

> Some of the injuries had to have occurred at separate times. The rib fracture was, again, a week to [three] weeks old. The scratches on the face and the laceration on the tongue and the eye injury were likely relatively more recent. . . .
>
> So, we know there was at least two separate episodes, but I can't tell you that the face injury, the mouth injury or the eye injury did or didn't happen at the same time.
>
> [Child Advocate: ] But they happened separate from the ribs?
>
> [A.] Yes.

*Id.* at 19-20.

- 12 -

Based on the foregoing testimony of Dr. McColgan, as well as Father's and Mother's explanations for Child's injuries, we discern no abuse of discretion by the court in finding Child was the victim of "child abuse" perpetrated by Father. ***See Interest of L.Z.***, 111 A.3d at 1174. We conclude the testimonial evidence demonstrates that Child's bilateral rib injuries satisfied the definition of "child abuse" under section 6303(b)(1)(i). ***See*** 23 Pa.C.S. § 6303(b)(1)(i). With respect to Child's injuries to her mouth, left eye, and face, we conclude that the testimonial evidence demonstrates that she suffered "child abuse" under section 6303(b)(1)(iii), as they created "an imminent risk of serious physical injury." Accordingly, we affirm the adjudication order. ***See*** 23 Pa.C.S. § 6303(b)(1)(iii).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/13/2015

- 13 -