J-S08044-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SARAH CLOUSER | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL CLOUSER | : | |
| | : | |
| Appellant | : | No. 1376 MDA 2021 |

Appeal from the Order Entered October 6, 2021
In the Court of Common Pleas of York County
Civil Division at No(s): 2016-FC-001261-03

BEFORE: BOWES, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.: **FILED: MAY 2, 2022**

Michael Clouser (Father) appeals from the custody order entered in the York County Court of Common Pleas, granting the petition of Sarah Clouser (Mother) to relocate with the parties' minor children, M.C. and C.C. (collectively, the Children), from Mechanicsburg, Cumberland County, Pennsylvania, to Emerald Isle, North Carolina. Father avers the trial court erred in: (1) limiting his presentation of evidence; (2) improperly weighing particular statutory custody and relocation factors; (3) improperly weighing M.C.'s testimony while disregarding C.C.'s testimony; and (4) finding relocation was in the Children's best interests. We affirm.

## I. Facts & Procedural History

Father and Mother, who were divorced in 2019, are the natural parents of the Children. N.T., 9/24/21, at 34. Their son, C.C., was born in June of

2011, and their daughter, M.C., in January of 2008. At the time of the underlying relocation hearing, the Children were 10 and 13 years old, respectively.

Mother initiated the instant custody action on July 13, 2016, following the parties' separation, by filing a complaint for shared legal custody and primary physical custody, along with notice of proposed relocation with the Children to Emerald Isle, North Carolina. Mother grew up in North Carolina, M.C. was born there, and her parents continued to live there. N.T. at 50. However, Mother soon withdrew her request to relocate. With Father's consent, she moved with the Children to Mechanicsburg, Cumberland County. On August 18, 2016, the trial court issued a stipulated order,[1] awarding the parties shared legal custody, Mother primary physical custody, and Father partial physical custody on Tuesday and Thursday evenings and alternating weekends.

In December of 2016, Mother filed a petition to modify custody, again seeking permission to relocate with the Children to North Carolina. Father filed a counter-affidavit, objecting to Mother's petition. Mother withdrew her request, and, on March 6, 2017, the parties stipulated to an order that awarded Mother primary physical custody during the school year, and Father

_____

[1] Several orders in this record reflect one date in the text of the order, but are entered on the trial docket one or several days thereafter. For ease of locating these orders in the record, we cite them with their docket entry dates.

- 2 -

enlarged partial physical custody. The parties also agreed the Children's maternal grandparents shall have custody for five weeks in the summer at their home in North Carolina, with the parties to share physical custody on an alternating weekly basis for the remainder of the summer.

Next, on February 28, 2018, Mother filed a petition to modify the custody order.[2] However, by stipulated order dated August 17, 2018, the trial court maintained the same custody order, including the parties' agreement for the Children to spend five weeks in the summer with their maternal grandparents in North Carolina.

Thereafter, on a date not apparent from the record, Mother remarried. She lived in Mechanicsburg with her husband, R.S. (Stepfather), and her two stepchildren, who are of similar age to the Children. N.T. at 53, 113. Mother and Stepfather also share a son, who was born in approximately 2018. *See id.* at 114 (son was three years old at the time of the September 2021 hearing). Mother and Stepfather thus have five children living with them. *Id.* at 53.

Father remarried in 2019. N.T. at 118. He and his wife, K.C. (Stepmother), reside in Adams County, which is 30 minutes from Mother's

_____

[2] Mother also sought a finding of contempt against Father, alleging that he, *inter alia*, refused to allow telephone calls while the Children were in his care, and failed to inform her that he had to work on certain Mondays and refused to tell her who was watching the Children.

home, along with his two stepchildren, who are also of similar age to the Children. *Id.* at 35, 118.

Sometime in July of 2021, Mother filed the underlying petition to relocate with the Children to North Carolina.[3] Mother averred, *inter alia*, that Stepfather received a job offer in North Carolina with a salary increase of approximately $10,000 and the opportunity to advance in the company, which was not available with his Pennsylvania employer. Father filed a counter-affidavit, objecting to relocation. On July 29th, Mother requested an expedited relocation hearing, noting Stepfather's new employment in North Carolina, as well as the Children's school year, would begin in August.[4]

The trial court conducted a relocation and custody hearing on September 24, 2021. The court first interviewed the Children *in camera*, separately, in the presence of the parties' counsel. N.T. at 4-31. As stated above, the C.C. was 10 years old and M.C. was 13 years old at this time. Both parties and the court referred to the expedited nature of the hearing, for

---

[3] Mother served notice of her request to relocate on Father around July 2, 2021. **See** Mother's Return of Service, 7/30/21. However, the notice is stamped with a "filed" date of July 30, 2021, and entered on the trial docket on that same day. Meanwhile, Father's counter-affidavit is stamped as "filed" approximately two weeks earlier, on July 14th, with a docket entry dated that same day.

[4] **See** 23 Pa.C.S. § 5337(g)(1) ("[E]xcept as set forth in paragraph (3) [pertaining to exigent circumstances,] the court shall hold an expedited full hearing on the proposed relocation after a timely objection has been filed and before the relocation occurs.").

example noting the amount of time left for the hearing. *See*, *e.g.*, N.T. at 47 (Father's counsel noting "we have less than an hour and 15 minutes," and trial court agreeing, stating, "Yeah, you've got to speed this up."), 71, 73 (trial court limiting both Mother's direct and cross examination, as it had to allow sufficient time for Father's testimony). Mother and Father testified first, and then Stepfather and Stepmother testified.

At the time of the hearing, the parties had informally agreed for Father to have more custody time than set forth in the March 2017 and August 2018 stipulated orders. N.T. at 36, 84. Whereas the 2018 order awarded Father custody on alternating weekends from Thursday after school to Monday morning, the parties extended custody through **Tuesday** morning, as well as alternating Monday overnights.

The parties stipulated they currently lived approximately 30 minutes from each other. N.T. at 35. Meanwhile, Mechanicsburg and Emerald Isle, North Carolina are 457 miles apart, and the driving time is approximately eight to nine hours. *Id.* at 36. The trial court had indicated its belief that the Children's schools in Mechanicsburg and the North Carolina schools were comparatively equal. *See id.* at 49.

Mother testified to the following. Stepfather was a project manager in the construction industry. N.T. at 51-52. He accepted an employment offer in North Carolina as a project engineer, which would present a salary increase of approximately $50,000 over six months, as well as more opportunities for

advancement than his current position. *Id.* at 51-53. This salary increase could allow Mother to work fewer hours. *Id.* at 49. Furthermore, whereas Stepfather currently commutes 1 hour and 20 minutes each way to his current job in Maryland, his commute in North Carolina would be 25 to 30 minutes. *Id.* at 53. Mother works as a dental hygienist, has applied for a dental hygienist license in North Carolina, and has contacted potential employers there. *Id.* at 52, 54-55.

Mother also testified her parents, in North Carolina, are retired and could help with supporting the family. N.T. at 53-54. According to Mother, the cost of living was lower in North Carolina, and Mother could "get the same size house that [she and Stepfather] own now," for "$400 less a month in mortgage." *Id.* at 55. Additionally, a public college in North Carolina would cost $5,000 to $6,000 less per year than a Pennsylvania public college. *Id.* at 58.

Mother explained why she desired to move to North Carolina with the children:

> The kids love it there. My husband got offered a position making more money which would allow me to work less so that I can volunteer more in the kids' classrooms. The kids love going fishing with my dad and golfing. They've made friends there through their summer camp that they've maintained contact with throughout the year.

*Id.* at 49. Mother stated that during the school year, she would transport the Children to Pennsylvania for long weekends, working with Father's schedule.

*Id.* at 39-40. Mother also agreed to Father having six to eight weeks' custody during the summer. *Id.* at 40.

Father testified to the following. During the school year, the Children sometimes spend Monday evenings overnight with their paternal grandmother and step-grandfather. *Id.* at 86. The Children also regularly visit with their paternal grandfather. *Id.* Father and the Children spend many weekends visiting Stepmother's parents and the Children's step-cousins. *Id.* at 85-86.

Father did not believe the Children "fully understand the impact of . . . relocation," as they may not understand that "all of the little things [they] do together" will become "hard to do anymore." N.T. at 93-94. Father believed relocation would hurt the Children's emotional development. *Id.* at 99. He testified the parties' son, C.C., "has always had an issue with confidence. And we've done a really good job of working on him with that [and] he has gotten a lot better, but he still has those tendencies[,] and if I'm not around[,] I won't be able to help him through it." *Id.* With respect to their daughter, M.C., Father testified she has had "a complete change in her demeanor." N.T. at 100. He explained, "She's very distant, she can be short with everyone in the house, especially the kids, and just wants to seclude herself." *Id.* Father and Mother both testified M.C. was receiving therapy. *Id.* at 72, 92. Father expressed concern he would not be able to support M.C.: "[S]he is dealing with [things] that she's not open about, and I don't believe that having her moving away where I will not be a part of her life will help." *Id.* at 100.

Father was also concerned that "after a couple trips back and forth" to North Carolina, the Children will "get tired of that drive and [not] want to make it anymore." N.T. at 94. He also calculated the Children would miss two days of school for each trip to Pennsylvania, and while "some days are remote learning," the Children would "be in the car, which is not a good environment [for] schoolwork." *Id.* at 94-95. The Children would also "be travelling late at night . . . and on nights before school nights," which could prevent "proper rest before school." *Id.* at 95. On cross examination, Mother agreed that each visit would involve at least 15 hours of riding in the car. *Id.* at 74.

M.C., age 13, testified *in camera* to the following. She stated she did not get along with Father about 75% of the time, and when asked why by the trial court, she responded, "Just as we grew older[,] we kind of grew apart I guess." N.T. at 11. With respect to the proposed relocation, M.C. stated:

> At first when [Mother] told us . . . I was kind of skeptical. I thought, well, there [are] a lot of people [in Pennsylvania] that I want to stay with, but as the year went on, I just kind of lost those people[. And] when I went to North Carolina . . . I felt . . . I could really connect with people there more, and I felt like that was more of a home [than] Pennsylvania[.] So I then decided that I would rather go to North Carolina than stay in Pennsylvania.

*Id.* at 15. M.C. explained that she attends a week of camp in North Carolina each summer, she "connected with a lot of people[, and t]hey're part of the reason why [she] wanted to go." *Id.* at 20. M.C. maintains contact with these

friends and feels they are better friends than her friends in Pennsylvania. *Id.* at 20-21.

C.C., age 10, testified *in camera* regarding his preference on relocation:

[C.C.:] I don't really want to move.

[Trial Court:] You really don't want to move. Your sister told me that you would say that.

A. Because my friends are here, my family is here[.] I don't really have any family in North Carolina other than grandpa.

Q. Well, you have a grandma and grandpa in North Carolina, don't you?

A. Yeah, but then I have a grandma and grandpa here. Four other ones — or six other ones here too, and a lot of family too.

N.T. at 29. When asked by the trial court whether he would, if he moved to North Carolina, want to spend more than half his summer with Father, even if M.C. did not spend the same amount of time, C.C. replied he would want to. *Id.*

As stated above, Stepfather and Stepmother also testified. Following the testimonial evidence, the trial court granted Mother's request to relocate with the Children and modified the existing custody order, effective upon relocation. The court reviewed, on the record, the statutory factors for relocation and custody[5] (discussed *infra*). N.T. at 129-38. Generally, the court adopted Mother's proposal for Father to have custody one weekend,

---

[5] *See* 23 Pa.C.S. §§ 5328(a), 5337(h) (discussed *infra*).

Friday through Sunday, each month. *See* Mother's Exh. M17. The court also granted Mother five weeks of custody in the summer, with Father having the remaining weeks. N.T. at 126. Mother was to provide all transportation for the visits to Father. *Id.* at 127. The court also "encourage[d] the parties to perhaps give [F]ather some more time in the summer with his son . . . who clearly expressed a preference to spend most of the summer with his father." *Id.* at 128.

The trial court entered its custody order on the docket on October 6, 2021. Father filed a motion for reconsideration, which the court denied on October 28th. Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). The court has also issued a Rule 1925(a) opinion.

## II. Statement of Questions Involved

On appeal, Father presents five issues for review, which we have re-ordered for ease of disposition:

> A. Whether the Trial Court committed an abuse of discretion or an error of law in precluding Father from introducing evidence, including testimony of witnesses, and limiting Father's ability to cross-examine Mother's witnesses?
>
> B. Whether the Trial Court committed an abuse of discretion or an error of law in considering, and heavily weighing, the increase in salary of Mother's husband and disregarding the evidence that the only family near the proposed relocation are Mother's parents with whom the [C]hildren already spend a significant period of time?
>
> C. Whether the Trial Court committed an abuse of discretion or an error of law in failing to consider that the relocation will deprive

- 10 -

the [C]hildren of having Father participate in school or extracurricular activities?

D. Whether the Trial Court committed an abuse of discretion or an error of law in considering the testimony of the parties' daughter while completely disregarding the testimony of the parties' son?

E. Whether the Trial Court committed an abuse of discretion or an error of law in granting Mother the ability to relocate with the [C]hildren to North Carolina where, as here, the evidence did not establish that the relocation was in the [C]hildren's best interest or permanent welfare or otherwise justified by the relocation factors set forth in Section 5337(h) of the Pennsylvania Child Custody Act[?]

Father's Brief at 5.

### III. Standard of Review

We note the scope and standard of review of a custody and relocation order:

> [T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it. . . . However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination. . . . Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

Moreover,

> [O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

- 11 -

> The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.
>
> The test is whether the evidence of record supports the trial court's conclusions.

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa. Super. 2014) (citations omitted).

"It is not this Court's function to determine whether the trial court reached the 'right' decision; rather, we must consider whether, 'based on the evidence presented, [giving] due deference to the trial court's weight and credibility determinations,' the trial court erred or abused its discretion. . . ." *King v. King*, 889 A.2d 630, 632 (Pa. Super. 2005). "[T]he knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." *Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa. Super. 2006).

## IV. Statutory Factors for Custody & Relocation

In custody cases, the paramount concern is the best interests of the child. *Saintz v. Rinker*, 902 A.2d 509, 512 (Pa. Super. 2006) (citation omitted). "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." *Id.* (citation omitted).

Section 5328(a) of the Child Custody Act sets forth factors to be considered by a trial court before fashioning a custody order:

> **(a)** *Factors.*—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.
>
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
>
> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.
>
> (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328(a)(1)-(16).

Furthermore, Section 5337(h), sets forth 10 factors that a trial court must consider when considering a petition for relocation:

**(h) Relocation factors.—**In determining whether to grant a proposed relocation, the court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

- 14 -

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S. § 5337(h)(1)-(10).

"The party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child as shown under the factors set forth in subsection [5337(h).]" 23 Pa.C.S. § 5337(i)(1). When rendering a decision on relocation that also involves a custody decision, the

trial court must consider all 10 statutory relocation factors and all 16 custody factors. ***A.M.S. v. M.R.C.***, 70 A.3d 830, 836 (Pa. Super. 2013).

## V. Trial Court's Assessment of Statutory Factors

Although Father presents specific challenges to only some of the statutory factors on appeal, we must review them against the trial court's full assessment of all 17 custody factors and 10 relocation factors. As stated above, the court made its findings of facts on the record at the September 24, 2021, relocation hearing. ***See*** N.T. at 129-38.

With respect to relocation, the trial court found that Section 5337(h)(1) through (7) favored relocation. It made the following findings. Under the Subsection (1) factor — nature, quality, extent of involvement and duration of the Children's relationships with their parents, siblings and other significant persons — Mother has been the majority caretaker "for quite some time." N.T. at 129. The court was pleased that "Father has . . . stepped up his game and spent more time with [the C]hildren over the last" two years, "but that has been with the full cooperation of [M]other, who has gone out of her way to make sure [F]ather . . . gets additional times." ***Id.*** With respect to the Subsection (2) factor — the Children's age, developmental stage, and needs and the likely impact relocation will have on their child's physical, educational and emotional development — M.C. was "very much in favor of the relocation" but C.C. was "really not in favor[.]" ***Id.*** at 130. Nevertheless, both "[C]hildren have moved in the past fairly frequently have been resilient to those

changes[,]" and M.C. "has started to look at colleges in the North Carolina area and seems to have quite a connection with [that] area." *Id.* Thus, on balance, "the benefit of the older child overcomes the detriment to the younger child[.]" *Id.*

With regard to the subsection (3) factor — the feasibility of preserving the relationship between the nonrelocating party and the Children through suitable custody arrangements — the trial court found its custody order granted "a substantial amount of time" for the Children to be with Father, and "found it admirable that [M]other is willing to provide all the transportation." N.T. at 130-31. The subsection (4) factor is the Children's preferences, which the trial court had addressed above. *See id.*

Next, the trial court found the subsection (5) factor — whether there was an established pattern of conduct of either party to promote or thwart the relationship of the Children and the other party — "weighed heavily in favor of relocation," as Mother has "tried [to] promote a good relationship between the [C]hildren and [F]ather." N.T. at 131-32. The court also found that under subsection (6) — whether the relocation will enhance the general quality of life for the relocating party, including a financial or emotional benefit — also weighed "heavily in favor of relocation." *Id.* at 132. Mother and her family will benefit financially, the maternal grandparents "are retired [and] nearby to help with the [C]hildren and other things," and "Mother will be able to work less and spend more time with the [C]hildren and their activities[.]" *Id.*

Finally, the trial court found the subsection (7) factor — whether relocation will enhance the general quality of life for the Children, including any financial or emotional benefit or educational opportunity — was "a little more difficult . . . to analyze." N.T. at 132. While "the [C]hildren will have some enhancement to their qualify of life, . . . they will not be able to spend quite as much time with [F]ather and will have these trips back and forth." *Id.* Nevertheless, the court considered the availability of FaceTime and Zoom, and that "children are spending virtual time with parents more and more." *Id.* at 132-33. The court thus concluded relocation would not make the Children's quality of life worse, but "will be at least the same, if not better." *Id.* at 133. The court found the remaining factors were either neutral or not applicable. *Id.* at 133-34.

With respect to the custody factors, the court weighed Section 5328(a)(1), (3), (7), (9) and (10) in Mother's favor. N.T. at 134-36. The court heavily weighed subsection 5328(a)(1) — which party is more likely to encourage contact between the Children and another party. The court considered that "[M]other has for at least the last three years made it so that [F]ather's partial custody rights are now . . . about 60/40. [T]he court trusts that [M]other will do likewise and try to make sure that [F]ather and these children have as much contact and relationship as possible[.]" *Id.* at 134. Further, the court heavily weighed Section 5328(a)(3), the parental duties performed by each party, and (10), which party is more likely to attend to the

Children's daily physical, emotional, developmental, educational and special needs. The court found, "[M]other has not only been the majority custodial parent in terms of time, but also . . . making sure the [C]hildren get to their games and practices and attending them and cheering them on." *Id.* at 135. The court also found subsections (7) and (9) — the Children's well-reasoned preferences, and which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the Children adequate for their emotional needs — weighed in Mother's favor.

However, the trial court weighed factor (4) — the need for stability and continuity in the Children's education, family life and community life — in Father's favor. N.T. at 135. The court found the remaining factors were either neutral or not applicable.

## VI.  Evidentiary Claims

In Father's first issue, he asserts the trial court abused its discretion in precluding him from presenting evidence and calling additional witnesses, and in limiting his cross examination of Mother. Father's Brief at 19-20. He avers the court commenced the relocation hearing at 1:30 p.m. and made it "clear that it would conclude the hearing that day." *Id.* at 19. Aside from Stepmother and Stepfather, the court "prohibited any additional witnesses." *Id.* at 20. Father concludes he was denied a full hearing on the important issue of whether the Children should be permitted to relocate more than 450 miles away. *Id.* We conclude this issue is waived.

It is well-settled that issues not raised in the trial court are waived and cannot be raised for the first time on appeal. Pa.R.A.P. 302(a). This Court has explained:

> On appeal, we will not consider assignments of error that were not brought to the tribunal's attention at a time at which the error could have been corrected or the alleged prejudice could have been mitigated. "[O]ne must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

*State Farm Mutual v. Dill*, 108 A.3d 882, 885 (Pa. Super. 2015) (*en banc*) (citations omitted).

Upon review of the relocation hearing transcript, we observe Father did not request testimony of additional witnesses. He also did not object to the court's limitation of his cross examination of Mother. *See* N.T. at 73 (trial court advising Father's attorney just before cross examination of Mother, "[Y]ou've got about five minutes so make the best of it."). Accordingly, any challenges related thereto are waived for our review. *See* Pa.R.A.P. 302(a); *State Farm Mutual v. Dill*, 108 A.3d at 885.

Furthermore, Father does not identify which witnesses he would have called, what they would have testified to, nor what additional evidence he would have presented. Without any explanation, Father's issues are also waived for failure to develop an argument. *See* Pa.R.A.P. 2119(a) (argument shall include such discussion as is deemed pertinent); *Harris v. Toys "R" Us-Penn, Inc.*, 880 A.2d 1270, 1279 (Pa. Super. 2005) ("failure to develop an

argument with citation to, and analysis of, relevant authority waives that issue on review").

## VII.  Challenges to Specific Statutory Factors

We address Father's second and third issues together.  First, he asserts the trial court abused its discretion in: (1) considering, as well as heavily weighing, the increase in Stepfather's salary; while (2) disregarding that the only family in North Carolina were the Children's maternal grandparents.  Father's Brief at 23.  Father maintains the "the only evidence" presented by Mother in support of relocation were her desire to reside in North Carolina, an increased financial benefit in the form of Stepfather's new job, and increased time with the maternal grandparents.  *Id.*  However, Father claims, "[t]hese alleged benefits are simply insufficient to warrant a relocation."  *Id.*

Father's third claim on appeal is that the trial court abused its discretion in failing to consider his limited ability to participate in the Children's school and extracurricular activities following relocation.  Father's Brief at 25.  Father reasons he would have to use vacation days to travel to North Carolina, where he would prefer to use his vacation days to spend time with the Children in Pennsylvania.[6]  Father also challenges the trial court's finding that he has, in the past, had to miss the Children's activities due to work.  *Id.* at 25-26.

---

[6] This issue was preserved for appeal, as Father testified to having to use vacation days to travel to North Carolina.  *See* N.T. at 90.

Father maintains there was no prior hearing in this case, and the court's finding is not supported by the evidence. *Id.* at 26. No relief is due.

First, pursuant to Section 5337(h)(6), the trial court was required to consider whether relocation will enhance Mother's general quality of life. *See* 23 Pa.C.S. § 5337(h)(6). Thus, the court properly considered Stepfather's increased salary, as well as Mother's consequent ability to work less and spend more time with the Children, and the availability of her parents to assist with the Children. *See* N.T. at 132. In addition, to the extent Father challenges the weight given to Stepfather's increase in salary, we defer to the findings of the trial court. *See A.V.*, 87 A.3d at 820.

Next, with respect to Father's limited ability to participate in the Children's activities in North Carolina, the trial court reasoned:

> The Court did take the impact that relocation would have on Father's ability to participate into consideration, as well as . . . his testimony about regretting having to miss parent-teacher conferences and various sporting activities due to his work. *See* [N.T.] at 87-90. The Court also noted Father's ability to attend events in its analysis of [Section 5328(a)(3):]
>
> > Factor number 3, the parental duties performed by each parent.
> >
> > While [F]ather has performed more duties as the years have gone on, he candidly admits that sometimes work gets in his way of going to practices and games and so forth. Clearly [M]other has not only been the majority custodial parent in terms of time, but also intention [sic] and making sure the [C]hildren get to their games and practices[,]attending them and cheering them on. That is one reason why the Court has kept [M]other in majority physical custody.

- 22 -

While the Court admires [F]ather has done his best, and it may be unavoidable on [F]ather's part, but he has had to make concessions to the parental duties for his job, which is unfortunate, but nevertheless that is a factor heavily in favor of [M]other.

Trial Ct. Op., 11/11/17, at 16-17 (paragraph breaks added), *quoting* N.T. at 134-35.

Father's assertion, that there was no evidence to support a claim that Mother retained primary physical custody due to his inability to participate in school or other activities, is belied by the record. Father testified to missing past activities. He acknowledged he was not able to attend every parent-teacher conference, but explained Mother has relayed any pertinent information. N.T. at 87. Father also testified that in the prior year, he missed "a lot" of M.C.'s volleyball games due to his work. *Id.* at 88. However, he watched the games on his work computer and texted with Mother to ask how M.C. was playing. *Id.* at 88-89. Father also acknowledged he missed C.C.'s Saturday football games, when he does not have custody, due to work. *Id.* at 89. However, when he is available, he makes "every effort to be there." *Id.* The trial court considered this testimony in reaching its conclusions. *See* N.T. at 135.

While Father's arguments do not address the remaining statutory custody and relocation factors, we review his claims against the trial court's assessment of all the factors. *See A.V.*, 87 A.3d at 820 (parties cannot dictate the amount of weight the trial court places on evidence, and we find no abuse

of discretion if the trial court's consideration of the Children's best interests was careful and thorough). The trial court properly considered these factors, and was within its discretion in weighing them, against the other statutory factors governing both relocation and custody. *See A.M.S.*, 70 A.3d at 836 (trial court must consider all 10 statutory relocation factors **and** all 16 custody factors when making a decision on relocation that also involves a custody decision). Accordingly, no relief is due.

## VIII. The Children's Testimony

In his fourth issue, Father asserts the trial court abused its discretion in considering M.C.'s testimony, while disregarding C.C.'s testimony. Father's Brief at 20. Father also claims the court "failed to consider improper influence by Mother," where Mother "admitted . . . during cross-examination . . . that [M.C.] has had a history of pitting the parents[ ] against each other," Mother has instructed M.C. "to delete messages," and Mother told M.C., "[I]f you want any chance of us moving[,] you have to go to court in one week. This is not the time to rock the boat." *Id.* at 20-21. We conclude no relief is due.

Sections 5337(h)(4) and 5328(a)(7) both require a trial court to consider a child's preference, considering the age and maturity of the child. 23 Pa.C.S. §§ 5328(a)(7), 5337(h)(4). Father does not address M.C.'s stated reasons for wanting to relocate; she testified she has a connection with her friends in North Carolina, who are better friends than her friends in

Pennsylvania. *See* N.T. at 20-21. She also stated North Carolina felt "more of a home than Pennsylvania." *Id.* at 15.

While noting that it was not bound completely by the Children's preference, the court considered that M.C. was "very much in favor of" relocation, while C.C. was "really not in favor." N.T. at 130. The court did not, as Father claims, disregard C.C.'s testimony, but instead weighed it less than M.C.'s testimony because she was older and more mature. *Id.*; Trial Ct. Op. at 15. The court reasoned:

> These children have moved in the past fairly frequently and have been resilient to those changes. The [c]ourt notes that the child wanting to relocate is the older of the two . . . and in fact has started to look at colleges in the North Carolina area and seems to have quite a connection with the North Carolina area[. T]herefore, the benefit to the older child overcomes the detriment to the younger child. [T]he court finds [the factor of the Children's preferences] in favor of relocation.

N.T. at 130. The court properly exercised its discretion in weighing the Children's testimony. *See A.V.*, 87 A.3d at 820 (parties cannot dictate the amount of weight the trial court places on evidence). On appeal, we do not disturb these findings. *See King*, 889 A.2d at 632 (this Court gives due deference to trial court's weight and credibility determinations).

With respect to Father's allegation of Mother's improper influence over M.C., we note this claim was not included in his Rule 1925(a)(2)(i) concise statement of errors complained of on appeal. Accordingly, it is waived. *See* Pa.R.A.P. 1925(b)(4)(vii).

In any event, we note that when asked by the trial court whether she talked to Mother or Father about relocation, M.C. replied she did not. *See* N.T. at 19. She stated, "[Mother] kind of just let me say what I want to say. She didn't really coach me or anything and I didn't talk to my dad about this because we're on different sides." *Id.* The trial court did not find Mother improperly influenced M.C.'s preference, and we would discern no abuse of discretion.

## IX. The Children's Best Interests

In his final issue, Father asserts the trial court abused its discretion, where the evidence did not establish that relocation is in the Children's best interests. Father incorporates the arguments presented in the foregoing issues. He further alleges the court considered Mother's personal happiness to the exclusion of the other relocation factors, especially his inability to exercise meaningful periods of custody. Father's Brief at 19. We decline to disturb the trial court's findings.

As stated above, the paramount concern in a custody matter is the child's best interests. *See A.V.*, 87 A.3d at 820. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual wellbeing." *Saintz*, 902 A.2d at 512. We have reviewed above the trial court's assessment of all the statutory custody and relocation factors.

Section 5337(h)(3) requires a trial court to consider "the feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties." 23 Pa.C.S. § 5337(h)(3). In assessing this factor, the trial court reasoned:

> It's always a difficult factor[ ] in these relocation trials. The Court has put together an order that will have a substantial amount of time of these children spending with their father [sic], and it is hoped as put forth in the order that the parties will try to arrange a way for [C.C.] to spend even more time with the nonrelocating party, the father. The Court found it admirable that [M]other is willing to provide all the transportation. Therefore, the Court has tried to make a custody arrangement with as little disadvantage to [F]ather's relationship with the [C]hildren as possible.

N.T. at 131.

Here, Father's existing custody schedule was modified to less, but more extended contact with the Children due to the geographical distance. Because Section 5337(h)(3) is one of 10 factors that the court had to weigh in assessing the Children's best interest, the necessity of altering Father's partial physical custody schedule does not, on its own, defeat the order granting Mother's proposed relocation.

The trial court emphasized at the conclusion of the hearing,

> Mom, you've obviously been pretty generous to [D]ad in the past about giving him extra time. When you get 8 hours away from him, I expect you to continue that and quite frankly if you don't, I hope he brings something into court because I might change it back, to be very blunt. . . .

- 27 -

N.T. at 138. **See also Jordan v. Jackson**, 876 A.2d 443, 452 (Pa. Super. 2005).

Based on our review of the record, the parties' briefs, and the trial court's assessment of all the statutory factors, we conclude the court's consideration of the Children's best interests was careful and thorough. **See A.V.**, 87 A.3d at 820. The court properly considered how relocation and a modification of the existing custody order would affect the Children's physical, intellectual, moral, and spiritual wellbeing. **See Saintz**, 902 A.2d at 512. In deferring to the trial court's weight and credibility determinations, and in light of the record evidence, we discern no abuse of discretion or reversible error.

Accordingly, we affirm the order granting Mother's petition to relocate and modifying the custody order.

## X. Conclusion

In conclusion, we affirm the order granting Mother's petition for relocation and modifying the parties' custody order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 05/02/2022